**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO et al., Plaintiffs,**

v.

**R. G. FREEMAN, III, Defendant.**

**Civ. A. No. 79–2955.**

United States District Court,
District of Columbia.

March 3, 1981.

Mitchell J. Notis and James R. Rosa, Washington, D. C., for plaintiffs.

Robert M. Tobias and William E. Persina, Washington, D. C., for plaintiffs-intervenors.

David H. Shapiro, Asst. U. S. Atty., Washington, D. C., for defendant.

## OPINION

HAROLD H. GREENE, District Judge.

This action is presently before the Court on cross-motions for summary judgment after an earlier denial of defendant's motion to dismiss. The plaintiffs [1] seek a declaratory judgment that regulations promulgated by the General Services Administration (GSA) requiring federal employees to pay for the use of parking spaces in facilities controlled by GSA or other federal agencies were not issued pursuant to legitimate statutory or other authority and are unlawful. They also request the Court to set aside these regulations, enjoin the Administrator of GSA from charging federal employees for parking in federal buildings, and order him to make restitution to the employees for monies paid for such parking.[2] The Court finds that the government acted without proper authority, and an order issued contemporaneously herewith accordingly grants summary judgment to plaintiffs and enjoins the further collection of parking fees.

---

1. Plaintiffs are three individual federal employees and six labor unions representing such employees. One other labor union (National Treasury Employees Union) and one additional federal employee intervened following denial of the motion to dismiss.

2. The Court's authority to take these various actions lies under the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*, and more specifically under section 706(2) which provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right ...." Declaratory judgment authority is granted by 28 U.S.C. § 2201.

The original complaint also contained a claim resting on the ground that plaintiffs' property rights under the Fifth Amendment were violated by the imposition of paid parking. In its Opinion of September 25, 1980, the Court found this claim to be without support.

## I

■ Although the President is the head of the Executive Branch and as such the manager of both federal employees and federal property, his powers with respect to both are generally[3] circumscribed by statute. It is likewise clear that when Congress enacts legislation granting specific powers to the President or to other officials in the Executive Branch, these powers must be exercised in accordance with such legislation and the congressional purposes. See *NFFE v. Brown*, D.C. Cir. No. 79–2394 (February 18, 1981). And to the extent that the relevant statutes contain explicit or implicit limitations or restrictions, they are binding upon the President and other Executive Branch officials as they are on all other citizens. In the consideration of issues of this case, these fundamental principles must be kept in mind.

On March 22, 1979, a packet of materials was sent to President Carter under a cover memorandum from two presidential aides entitled "Energy Issues."[4] Among other materials, the packet contained a four-page document entitled "Phase-out of Federal Employee Parking Subsidies" (Parking Paper). This document framed the following issue for the President's consideration:

> Should parking subsidies for Federal employees be phased-out at location where nongovernment workers typically pay commercial parking rates? (The authority for implementing such action rests with OMB under GAO rulings involving Federal Property and Administrative

Services Act [40 U.S.C. §§ 471 et seq.]). Parking Paper, p. 1.

After considering the pros and cons of eliminating the subsidy,[5] the paper stated that the head of the Office of Management and Budget (OMB) had concluded that the subsidy should be phased out in all urban areas in the United States and not merely in the nation's capital. He proposed that, should the President have no objection, OMB would issue a draft circular to that effect to all federal agencies in April, 1979, to be followed by a final circular some time later after agency comments had been received. The paper also contained a schedule for the phasing in of the fees, with the full rate to go into effect in October, 1981. The last page of the document contains a decision block; next to the words "Agree. Issue draft circular" are a checkmark and the President's initial.

The President addressed the Nation on April 5, 1979 to discuss the severity and deterioration of the nation's energy problems, and to propose programs directed towards energy conservation and the reduction of the dependence of the United States upon imports of foreign oil. As part of the proposed effort, he stated that

> Steps will be taken to eliminate free parking for government employees in order to reduce the waste of energy, particularly gasoline, in commuting to and from work.[6]

Referring to this presidential address, OMB issued Circular No. A–118 which es-

---

**3.** The President, of course, also has considerable inherent powers in his capacity as the head of the Executive Branch. See, *e. g., Myers v. United States*, 272 U.S. 52, 54 S.Ct. 628, 78 L.Ed. 1483 (1926) (holding that the power to remove subordinates inherently belongs to the President as constitutional head of the Executive Branch).

**4.** Defendant's Supplemental Memorandum in Support of Motion for Summary Judgment, p. 1, and attachment.

**5.** The "pros" include the encouragement of transit use and carpooling; possible daily savings of "hundreds of thousands of miles of vehicle travel, tens of thousands of gallons of gas, and tons of pollutants"; removal of a benefit provided to some federal workers but not

extensively to non-government employees; setting an example, "which, if emulated by the private sector, could eventually produce nationally significant changes in energy consumption, transit use, and commuter traffic congestion; cost recovery of $31 to $47 million annually"; reduction of disparity among agencies; etc. Parking Paper, pp. 2–3.

The "cons" focus primarily upon adverse effects on the morale of federal workers (including the possibility of triggering a general strike by government employees). Parking Paper, p. 3.

**6.** Weekly Compilation of Presidential Documents, April 5, 1979, p. 614.

tablished a policy of phasing in fees for the use of parking heretofore provided without charge to federal employees. The circular was distributed in draft form to federal agencies and employee unions for comment on April 6, 1979, and it was published in final version on August 17, 1979. 44 Fed. Reg. 48638. As promulgated, the circular establishes a schedule of fees which follows that set forth in the presidential Parking Paper described above, and it vests responsibility in GSA for issuing implementing regulations. Pursuant to this authority, GSA, on September 6, 1979, issued Temporary Regulation D–65 which prescribed the assessment of charges for the use of parking spaces by federal employees. 44 Fed. Reg. 53161. That regulation became effective on November 1, 1979.

Plaintiffs argue that GSA failed to exercise the discretion vested in it by statute but instead improperly relied on orders from OMB. They further claim that, in any event, the Executive Branch was without authority under law to impose paid parking on federal employees as a means of achieving a reduction in the consumption of energy. The government asserts that it was acting pursuant to lawful authority under the Federal Property and Administrative Services Act as amended, in particular upon that part of the Act which is codified in 40 U.S.C. § 490 (hereinafter referred to as the Public Buildings Amendments).[7] It thus becomes necessary to examine the provisions of that statute and its purposes.

## II

Sections 490(j) and 490(k) of title 40, U.S. Code, provide in relevant part that

(j) The Administrator is authorized and directed to charge anyone furnished services, space, quarters, maintenance, repair, or other facilities (hereinafter referred to as space and services), at rates to be determined by the Administrator from time to time and provided for in regulations issued by him. Such rates and charges shall approximate commercial charges for comparable space and services, except that with respect to those buildings for which the Administrator of General Services is responsible for alterations only . . . the rates charged the occupant for such services shall be fixed by the Administrator so as to recover only the approximate applicable cost incurred by him in providing such alterations.

(k) Any executive agency, other than the General Services Administration, which provides to anyone space and services set forth in subsection (j) of this section, is authorized to charge the occupant for such space and services at rates approved by the Administrator.

The government's account as to how these statutory sections should be interpreted with respect to parking since they took effect in 1972, and its argument based thereon may be summarized as follows. Subsection (j) requires GSA to charge other agencies for parking space which it provides to them and their employees. Subsection (k) grants to the agencies the discretion to pass those charges on to those of their individual employees who actually use the spaces, but it must do so at rates approved by GSA. GSA has imposed parking space charges on the agencies themselves since 1975. The individual agencies had failed to charge individual employees for their parking until Temporary Regulation D–65 was issued in 1979 only because GSA had not, until then, approved rates to be used in assessing such fees. GSA, in turn, had not promulgated these rates because OMB had failed until 1979 to formulate a "national parking fee policy."[8] With the publication

---

**7.** The Public Buildings Amendments of 1972, Pub.L. 92- 313, added section 490(j), which authorizes and directs the Administrator of GSA to charge anyone furnished with space at rates to be determined in GSA regulations, and section 490(k), which authorizes executive agencies other than GSA to charge occupants of

space provided by them at rates approved by GSA.

**8.** Section 7 of the Public Buildings Amendments (40 U.S.C. § 603 note) provides that
To carry out the provisions of the Public Buildings Amendments of 1972, the Administrator of General Services shall issue such regulations as

of Circular No. A–118 that policy had finally emerged; GSA could and did promulgate procedures for the establishment of rates to be used by the agencies in charging fees to their employees; and the agencies then could and did impose such charges. Finally, it is claimed by the government that the President had the authority, acting through OMB and the Parking Paper, to exercise for the various agencies their statutory discretion with respect to the issue of whether their employees should be charged for parking.

■ Considering the last point first, the Court agrees with the government that 40 U.S.C. § 486(a) [9] authorizes the President to direct the various governmental agencies within the Executive Branch in the exercise of their discretion with respect to federal property management.[10] For purposes of the disposition of this case, the Court will also assume, without deciding, that a checkmark in a decision block on a memorandum addressed to the President constitutes a valid delegation from the President to OMB; [11] that section 490 could be interpreted to give to OMB, GSA, or both, the authority, singly or in combination, to require individual employees to pay for parking (as distinguished from imposing that requirement only on the agencies themselves); [12] and that GSA had the power to establish parking rates when it did.[13] Given these premises, the question is—did the Public Buildings Amendments

---

he deems necessary. Such regulations shall be coordinated with the Office of Management and Budget, and the rates established by the Administrator of General Services pursuant to sections 210(j) and 210(k) of the Federal Property and Administrative Services Act of 1949, as amended [40 U.S.C. § 490(j) and (k)] shall be approved by the Director of the Office of Management and Budget.

**9.** 40 U.S.C. § 486(a) (section 205(a) of the Federal Property and Administrative Services Act) authorizes the President to

prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the Administrator and executive agencies in carrying out their respective functions hereunder.

**10.** See *AFL–CIO v. Kahn*, 618 F.2d 784 (D.C. Cir. 1979) (section 486(a) authorizes the President to use the procurement provisions of the Federal Property and Administrative Services Act to deny contracts to companies not in compliance with voluntary wage and price standards, in order to further anti-inflation policy); *Farmer v. Philadelphia Electric Company*, 329 F.2d 3, 7 (3d Cir. 1964) (authority to issue order and regulations requiring nondiscrimination provisions in government contracts stems from section 486(a)); see also *NFFE v. Brown, supra* ("within the range of choice allowed by statute, the President may direct his subordinates' choices" slip op. at 9).

**11.** This Court's Opinion of September 25, 1980, denying defendant's motion to dismiss, stated that the President's speech of April 5, 1979, "is an insufficient basis for the exercise of lawful authority by executive agencies," and that OMB did not have the statutory authority without some more formal delegation to compel GSA to establish parking charges for individu-

als at commercial rates. At the time that Opinion was issued, the Court had not yet been made aware of the March 22, 1979 Parking Paper. Given the conclusions of Part III and IV, *infra*, the Court need not decide whether a Presidential speech or a checkmark on a memorandum was sufficient to delegate authority to OMB, or whether a more formal writing such as an Executive Order or proclamation was required.

**12.** However, nowhere in the congressional committee reports on the Public Buildings Amendments or the floor debates is there any suggestion of charging individual federal employees for their use of space; the emphasis throughout is upon requiring the *agencies* to justify their needs for space. See, *e. g.*, the remarks of Representative Gray:

Under present law, any agency of Government can request as much space as they want without having to request one cent in their budget.

We know for a fact that indiscriminate requests have been made for space that is now costing the taxpayers millions of dollars per year. By requiring every agency to pay for the space they use in all Government owned or rented buildings for the first time in our history we will know exactly what it is costing us to provide this space. 118 Cong. Rec. 13500 (1972).

**13.** There is some question as to GSA's authority in that regard after 1975. Section 11 of the Public Buildings Amendments of 1972, (40 U.S.C. § 603 note) states that

[t]he effective date of applying the rates to be charged pursuant to the regulations to be issued under subsections (j) and (k) [of section 490] shall be determined by the Administrator of General Services but in any event shall not be later than the beginning of the

provide a valid basis for the exercise of the President's authority under the circumstances of this case?

### III

■ The answer to this question turns on the legislative purposes underlying the Public Buildings Amendments; the purpose of the government in imposing parking fees; and the applicability to the present situation of the Energy Policy and Conservation Act, 42 U.S.C. § 6201 *et seq.* (EPCA).

As their legislative history shows, the Public Buildings Amendments had a very concrete and narrow purpose. At the time of their enactment in 1972, sixty-three federal construction projects already long approved by Congress languished (either unfinished or not yet begun) because of inefficiencies in the federal building program managed by GSA. In response to this problem, the Amendments established charges, first, to provide GSA with a building fund, drawn from the budgets of agencies utilizing GSA space, to be used for pending and future construction projects, and second, to induce agencies to use caution in their requests for new space. See H.R. Rep. No. 989, 92nd Cong., 2d Sess. (1972), U.S.Code Cong. & Admin.News 1972, p. 2370; 118 Cong.Rec. 13499–13510 (1972) The legislative history demonstrates

> that the congressional purpose pervading passage of the Public Buildings Amendments of 1972 was to make government agencies accountable for the space they utilize and to prevent agencies from demanding space in excess of their needs.[14]

Nothing in the language of the statute or its legislative history lends the slightest support to the proposition that parking fees might be required or authorized as a means of energy conservation. Yet the 1979 paid parking plan had precisely that objective.

When the notion of a paid parking plan was first brought to the attention of the President in the March 22, 1979, Parking Paper, it was part of a packet of materials labeled "Energy Issues," and among the reasons listed in its favor were possible daily savings of "tens of thousands of gallons of gas" and setting an example which "could eventually produce nationally significant changes in energy consumption." See note 5, *supra.* When the plan was first announced publicly, in the presidential address of April 5, 1979, the only reason given was "to reduce the waste of energy, particularly gasoline, in commuting to and from work." Weekly Compilation of Presidential Documents, April 5, 1979, p. 614. A White House Press Release issued the same day as a fact sheet on the President's Energy Program lists the phase-out of free parking for federal employees under the heading of "Longer Term Conservation Activities," and notes that possible elimination of "over 100,000 miles of vehicle travel each day in the downtown Washington, D. C. area alone, saving 5,500–6,000 gallons of gasoline per day." White House Fact Sheet on the President's Program, April 5, 1979, p. 6 (attached to Defendant's Statement of Material Facts as to Which There is No Genuine Issue). The reasons for instituting parking charges cited in OMB Circular No. A–118, upon which the GSA regulation rested, likewise focus on reduction of energy consumption.[15]

While reasons other than energy conservation have been offered in support of the paid parking plan—such as reductions in

---

third full fiscal year subsequent to the enactment [of the Public Buildings Amendments of 1972].

Read literally, this section requires the government to establish rates for employees and to apply those rates no later than 1975 (see 52 Comp.Gen. 957, 958 (1973)). The government did neither until 1979.

**14.** *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 1004 (D.C. Cir. 1979).

**15.** The Circular states that the

energy constraints on our nation are already requiring changes in driving patterns . . . . Free or low-cost parking biases an employee's decision whether to drive alone, carpool or use public transit for commuting. Therefore, a basis for charging for the use of parking facilities needs to be established which is . . . consistent with related policies regarding air quality, energy conservation and reduced traffic congestion. 48 Fed.Reg. 48638.

traffic congestion and air pollution, savings to the taxpayers, and the elimination of disparities in treatment between federal employees and their counterparts in the private sector [16]—there can be no question but that these were merely incidental. The plan originated in the context of energy conservation, energy conservation was its focus and indeed its entire *raison d'etre*, and it has consistently been presented to the President, to the agencies, and to the public in that context.[17]

Since the purposes of the 1979 parking plan were wholly different from those sought to be achieved by the 1972 Public Buildings Amendments, there is a serious question whether the former could have validly been implemented in reliance on the latter under any circumstances. See also notes 11 to 13 *supra*. It is not necessary, however, to decide that issue in the abstract because of the existence of an entirely different statute enacted subsequently,[18] which deals directly and specifically with the subject of energy conservation.[19]

## IV

The Energy Policy and Conservation Act was enacted by the Congress in 1975 in order, among other reasons, .

to grant specific standby authority to the President, subject to congressional review, to impose rationing, *to reduce demand for energy through the implementation of energy conservation plans*, and to fulfill obligations of the United States under the international energy program. (emphasis added) 42 U.S.C. § 6201(1).[20]

Under section 6262(a)(1), the President is authorized to prescribe "one or more energy conservation contingency plans." An "energy conservation contingency plan" is defined as "a plan which imposes reasonable restrictions on the public or private use of energy which are necessary to reduce energy consumption." The plan to impose fees for previously free parking, as embodied in OMB Circular No. A–118 and GSA Temporary Regulation D–65, falls squarely within that definition: it imposes restrictions on the use of energy and its purpose is to reduce energy consumption. See also, Opinion of September 25, 1980, p. 6.

Under the EPCA, an energy conservation plan cannot become effective unless the President first transmits it to Congress for approval by a resolution of each House. 42 U.S.C. § 6261(b).[21] The paid parking plan

---

**16.** See Defendant's Supplemental Memorandum in Support of Motion for Summary Judgment, p. 1.

**17.** Of course, any action whose intended effect would be energy conservation would predictably have other consequences—some desirable, such as cost savings, and some unpleasant, such as the alienation of the segment of the population from which sacrifices are being asked. The paid parking plan is no exception.

**18.** Where there is a conflict between two statutes, "the latest legislative expression prevails, and the prior law yields to the extent of the conflict." 1A Sutherland Statutory Construction § 23.09 (4th ed., 1972).

**19.** See 2A Sutherland Statutory Construction § 51.05 (4th ed., 1972) stating:

Where one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is any conflict, the latter will prevail, regardless of whether it was passed prior to the general statute.

**20.** See also, *Independent Gasoline Marketers Council, Inc. v. Duncan*, 492 F.Supp. 614, 620 (D.D.C.1980).

**21.** 42 U.S.C. 6261(b) provides that no contingency plan may become effective unless

(1) the President has transmitted such contingency plan to the Congress in accordance with section 6422(a) of this title [providing for expedited congressional consideration];
(2) such contingency plan has been approved by a resolution by each House of Congress in accordance with the procedures specified in section 6422 of this title; and
(3) after approval of such contingency plan the President—
(A) has found that putting such contingency plan into effect is required by a severe energy supply interruption or in order to fulfill obligations of the United States under the international energy program, and
(B) has transmitted such finding to the Congress, together with a statement of the effective date and manner of exercise of such plan.

These procedures were followed with regard to the Energy Building Temperature Restric-

was never transmitted to Congress in accordance with these statutory requirements, and it is therefore clearly invalid for lack of compliance with section 6261 unless it somehow technically escapes being an "energy conservation contingency plan." The government argues that this is so for two main reasons.[22]

First, it is asserted that the contingency plan requirements apply only to those energy conservation measures which impact throughout the national economy, and that, since the paid parking plan affects only the public sector, these requirements are not applicable. One short answer is section 6262 which explicitly covers plans imposing restrictions on "*public or* private use of energy." 40 U.S.C. § 6262(a)(1) (emphasis added). Beyond that, the only support the government offers for its premise that a national impact is required is section 6261(f) which deals with evaluation statements which must be transmitted to Congress.[23] But there is nothing in that provision which explicitly or by necessary implication limits contingency plans to measures having a national impact.[24] Beyond that, however, it is clear that the parking plan does have such an impact. It is not limited to federal

employees in the nation's capital but extends to 130,000 parking spaces used by federal employees throughout the country.[25]

Second, it is claimed that under section 6262 the charges to employees for parking could not have been proposed as an energy conservation plan because they are "user fees." Section 6262(a)(2) states that

[a]n energy conservation contingency plan prescribed under this section may not—

(A) impose rationing or any tax, tariff, or user fee;

(B) contain any provision respecting the price of petroleum products; or

(C) provide for a credit or deduction in computing any tax.

Since user fees are excluded from the scope of section 6262, the government concludes that the paid parking plan could be imposed by the President on his own authority, subject to no congressional review whatever.

EPCA provides the President with the authority to impose measures to achieve conservation subject to an *expedited* congressional review procedure. See 42 U.S.C. § 6422. The other subjects excluded from that procedure by virtue of section

---

tions,' Energy Conservation Contingency Plan No. 2, 44 Fed.Reg. 12911 (March 8, 1979), which was transmitted to Congress on March 1, 1979, approved by each House, and put into effect by Presidential Proclamation 4667 of July 10, 1979, 44 Fed.Reg. 40629, in which a finding of "severe energy supply interruption" was made and its transmittal to Congress noted.

**22.** A third reason that surfaces periodically in the government's briefs is that since the parking plan will also have consequences other than energy conservation, and since those other consequences were recognized by the Administration from the start, the measure "cannot be reasonably perceived as a program subject to the contingency plan provisions" of EPCA. Defendant's Supplemental Memorandum in Support of Motion for Summary Judgment, p. 2. The Court finds this conclusion to be untenable. As stated above (pp. 8–9 and note 15, *supra* ) the genesis of the paid parking plan lay in energy conservation, and that has consistently remained its primary purpose; that other reasons may also have made it an attractive policy for the Executive Branch does not detract from that basic fact. Nowhere does section 6262 restrict itself to plans whose *only*

impact is on energy conservation. See also note 17 *supra*.

**23.** 42 U.S.C. § 6261(f) provides in pertinent part that

Any contingency plan which the President submits to the Congress ... shall be based upon a consideration of, and to the extent practicable, be accompanied by an evaluation of, the potential economic impacts of such plan, including an analysis of—
(1) any effects of such plan on—
(A) vital industrial sectors of the economy;
(B) employment (on a national or regional basis);
(C) the economic vitality of States and regional areas;
(D) the availability and price of consumer goods and services; and
(2) any potential anticompetitive effects.

**24.** There is also no evidence that Congress intended that, simply because an analysis of certain aspects of a plan's impact was required, a plan without such an impact was to be excluded from the scope of the Act.

**25.** White House Fact Sheet, *supra*, p. 6.

6262(a)(2)—taxes, rationing, and petroleum price provisions—are all measures that are traditionally reserved to the Congress itself, as distinguished from being within the President's discretion or constituting joint responsibilities. The conclusion to be drawn from this scheme is that section 6262(a)(2) excludes these subjects from the energy conservation contingency plan procedure not, as the government suggests, in order to relegate them to unbridled presidential jurisdiction but, on the contrary, to reserve them to the normal process of congressional review and legislation.[26]

The legislative history of EPCA supports this interpretation. The decision to subject the exercise of presidential conservation plan authority to congressional review was a reaction to and constituted a rejection of an energy program proposed by the President. The President's plan had placed reliance on increasing prices as the singular means for curtailing energy demand and maximizing energy supplies. There was strong opposition to the grant of unrestricted power over prices to the President. Congress ultimately responded by legislation which, while giving the President standby conservation authority subject to limited congressional review,[27] excluded from that grant those subjects which it believed were properly reserved to regular legislative treatment—rationing, prices, taxes, and user fees.[28]

## V

In 1972, Congress enacted legislation authorizing the General Services Administration to charge other federal agencies for the space they use in government-owned facilities. The plain purpose of this legislation was to induce government officials to prudence and conservatism in their construction and maintenance requests and thus to serve the cause of economy in government. For the first seven years of its life, the statute was used in just that way: agencies paid with funds from their own budgets for space and service requirements, but the individual federal employees—who as such have no relation to the budget-transfer process—were not charged fees at commercial rates for the parking spaces they used. See 55 Comp.Gen. 897 (1976).

In 1975, Congress passed another statute, the Energy Policy and Conservation Act, addressed to a wholly different problem, that of energy conservation. Four years later, the Office of Management and Budget recommended to the President that, as part of his energy conservation program, he direct the imposition of parking fees for federal employees. From the point of view of swift and dramatic action, the EPCA suffered from the obvious defect, however, that it required prior congressional review and concurrence. OMB seized upon[29] the 1972 law, which does not necessitate such review, as its authority for the parking measure.

Whatever may be the powers generally of the President with respect to federal employees and federal property, when he is given authority by law for certain specified

---

**26.** The Court does not need to decide today whether the parking charges do indeed constitute user fees under section 6262(a)(2). It is clear that if the charges are not user fees, then the paid parking plan is an "energy conservation contingency plan," and compliance with the EPCA procedures for expedited congressional review was required. If the charges do constitute user fees, then new legislation was required to authorize their imposition for conservation purposes. In either event, the President acted without the requisite legislative authorization.

**27.** See 42 U.S.C. § 6201(1); H.R.Rep.No.340, 94th Cong., 1st Sess. 3–8 (1975), U.S.Code Cong. & Admin.News 1975, p. 1762.

**28.** See *Independent Gasoline Marketers Council, Inc. v. Duncan, supra,* where the court interpreted section 6262(a)(2) as precluding the use of demand-side incentives (in the form of a 10 cent per gallon gasoline conservation fee) to lower overall gasoline consumption.

**29.** It is difficult to believe that the seven-year delay between the time of the enactment of the Public Buildings Amendments and their claimed implementation through issuance of the OMB and GSA regulations was due simply to bureaucratic difficulties (see pp. 5–6, *supra* ), or that the resolution of these problems and the need for adopting the President's energy program occurred simultaneously by coincidence.

purposes, he is required to operate within those statutory limits and to exercise the authority thus granted to achieve those purposes (rather than some other objective, regardless of its desirability). It is not necessary here to explore the outer limits of the exceptions to that rule,[30] for at least where the Congress has spoken also with regard to the claimed exception, the President is without power to rely upon more general authority to override a specific congressional command. Thus, when Congress specified in the EPCA that energy conservation plans could be implemented only after congressional review and with congressional concurrence, the President was not free to ignore that mandate.

For the reasons stated, the Court declares GSA Temporary Regulation D–65 to be invalid and defendant's actions in charging federal employees for parking spaces in and about federal buildings to be unlawful. In an accompanying order, the regulation is set aside and its enforcement is being permanently enjoined. As for the matter of restitutive relief, the parties have not as yet adequately briefed such issues as whether there is any entitlement to such relief; if the answer is in the affirmative, who is entitled to restitution[31] and in what amount; and what mechanism is to be employed for identifying those entitled to restitution and for computing and achieving such relief. Accordingly, today's order requires that further memoranda be filed on the various restitution issues.

---

**30.** In unusual circumstances, statutory authority granted for one purpose may be employed also to achieve other important government ends. See, *e. g., Farmer v. Philadelphia Electric Co., supra.*

**31.** *E. g.,* the individual plaintiffs, the members of the plaintiff labor unions, or all federal employees who paid for parking since November 1, 1979.