**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO et al.**

v.

**Gerald P. CARMEN, Administrator, General Services Administration, Appellant.**

No. 81–1244.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 21, 1981.

Decided Dec. 15, 1981.

Kenneth M. Raisler, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., Royce C. Lamberth, and David H. Shapiro, Asst. U. S. Attys., Washington, D. C., were on the brief for appellant.

Mitchell Jay Notis, Washington, D. C., with whom James R. Rosa, Washington, D. C., was on the brief for appellee American Federation of Government Employees.

John F. Bufe, Washington, D. C., with whom Robert M. Tobias, Washington, D. C., was on the brief for appellee National Treasury Employees Union.

Before ROBINSON, Chief Judge, ROBB and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

In November 1979, the government began phasing out free employee parking on federal property. On the complaint of individual employees and unions representing federal workers, the district court, 510 F.Supp. 596, in March 1981, ordered a permanent stop to the parking charges.[1] The government asserted, and the district court assumed *arguendo*, that the President, and executive branch agencies acting at his direction, had authority to institute the parking charges under the Federal Property and Administrative Services Act (FPASA).[2] Nonetheless, the district court concluded that the energy conservation purpose the President sought to advance through the charges placed the plan under governance of newer legislation, the 1975 Energy Policy and Conservation Act (EPCA).[3] Concededly, the President had not proceeded as speci-

---

1. On March 6, 1981, the district court denied the Administrator's motion for a stay of the injunction pending appeal. One week later, this court denied an emergency motion for a stay pending appeal. By further order, issued in May 1981, the district court directed restitution of all monies federal employees paid to the government as parking fees, but stayed restitutive payments pending this appeal.

2. As amended by the Public Buildings Amendments of 1972, 40 U.S.C. §§ 471 *et seq.*

3. 42 U.S.C. §§ 6201 *et seq.*

fied in that Act.[4] Therefore, the district court held the executive action unlawful.

We conclude that the parking charges were authorized by and validly imposed under the FPASA and that the EPCA does not subtract from authority the FPASA grants to the President. Accordingly, we reverse the district court's judgment and remand with instructions to enter judgment in favor of the Administrator. In this opinion, we set out first the chronology of relevant events; next, the bases for our determination that the FPASA authorizes the executive directives at issue here; and, finally, our reasons for concluding that the EPCA, which augments initiatives available to the President to promote energy conservation, does not truncate or displace pre-existing FPASA authority.

I. The President's Decision and Its Implementation

A. *The parking issue paper: a multi-purpose proposal contained in an energy packet*

On March 22, 1979, President Carter received from two of his Domestic Policy Staff aides a packet of materials under a cover sheet captioned "Energy Issues." One of the items in the packet was a four-page issue paper headed "Phase-out of Federal Parking Subsidies." The paper presented the following question for the President's decision: "Should parking subsidies for Federal employees be phased-out at locations where nongovernment workers typically pay commercial parking rates?"[5] Air quality, transportation policy, and ener-

gy conservation concerns were cited in support of eliminating the subsidies. The paper further stated that the estimated annual cost recovery to the government would be in the $31 to $47 million range. In addition, the paper pointed out that for those who drive alone, the annual before-tax subsidy could amount to $1,100 or more; employees in carpools reaped a much lower individual benefit; persons using mass transit or working for agencies that lacked parking facilities received no subsidy at all for the cost of the trip to work. As the principal reason against ending parking subsidies, the paper cited adverse effects on the morale of federal workers. A "conclusions and recommendations" section stated that the head of the Office of Management and Budget (OMB) considered the phase out "the right way to go"; it indicated the course on which OMB would proceed, commencing with distribution of a draft circular to federal agencies, if the President had no objection. The paper's final page set out Decision lines. The line facing "Agree. Issue draft circular." bears a checkmark and the President's initial.[6]

B. *The President's energy address and accompanying fact sheet: a single-issue speech and a more detailed White House release*

In an April 5, 1979 address to the nation on the country's serious and worsening energy problem, President Carter announced numerous actions, plans, and proposals to "move us away from imported oil and toward a future of real energy security."[7]

---

**4.** The EPCA empowers the President to propose and transmit to Congress "energy conservation contingency plans" to reduce demands for energy. Such plans are short-term measures; they may remain in effect for an initial period of not more than nine months. The President's role is that of initiator; plans may become effective only if approved by a resolution of each House of Congress. 42 U.S.C. § 6261.

**5.** In parentheses after the question this notation appears: "(The authority for implementing such action rests with OMB under GAO rulings

involving Federal Property and Administrative Services Act.)."

**6.** The paper indicates that supporters of the "Agree" position included the OMB, the Council of Economic Advisors, the Treasury Department, the Department of Energy, the Environmental Protection Agency, and the Council on Environmental Quality. The "Disagree. Take no action." position, the paper notes, was advanced by the Domestic Policy Staff.

**7.** 15 Weekly Comp. of Pres.Doc. 609, 614 (April 5, 1979).

One sentence in the list of measures the President announced concerned the parking subsidy phase out:

> Steps will be taken to eliminate free parking for Government employees in order to reduce the waste of energy, particularly gasoline, in commuting to and from work.[8]

A fact sheet released simultaneously with the President's speech by the White House Press Secretary provided further detail on items mentioned in the address. "Phase out of Free Parking for Federal Employees" appears in the fact sheet under the main heading "Longer Term Conservation Activities."[9] The fact sheet stated that "[t]he President has directed the Office of Management and Budget to begin phasing out subsidized parking for federal employees." It further stated that fees for parking "are intended to encourage greater carpooling and use of mass transit for commuting, and to recover the $35–40 million in costs which are borne by the general taxpayer."

### C. OMB's Circular and GSA's Regulation

The day following the President's address, OMB distributed to federal agencies and federal employee unions a draft of Circular No. A–118, establishing policy on federal employee parking charges. Published in final version on August 17, 1979,[10] the circular cited, in addition to an energy conservation purpose, concerns about air quality, traffic congestion, and equity among federal employees. The Federal Register preamble referred to the President's April 5, 1979 energy address and also identified the expected $35 to $40 million saving in public funds. As authority for the parking charges, the circular cited the FPASA, as amended (40 U.S.C. § 490),[11] and referred to a 1976 Comptroller General review of the matter (55 Comp.Gen. 897);[12] it next described the responsibilities of the General Services Administration (GSA), *inter alia*, to determine rates and issue implementing regulations.[13]

On September 6, 1979, GSA issued Temporary Regulation D–65, prescribing policies and procedures for the assignment of federal employee parking spaces and the assessment of charges for the use of such spaces.[14] That regulation became effective November 1, 1979. Federal agencies, pursuant to OMB Circular No. A–118 and GSA Temporary Regulation D–65, started phasing in parking charges on or shortly after that date.[15] Some sixteen months later,

---

**8.** *Id.* at 613. It was entirely consistent with the single-issue context of the President's speech to identify only the energy-related reason for instituting parking charges.

**9.** Fact Sheet on the President's Program, April 5, 1976, at 6. Earlier in the release, short-term energy saving measures were listed, first among these, a standby conservation plan on thermostat settings in nonresidential buildings for which the President sought congressional approval under the EPCA. For federal buildings, however, implementation did not await the Presidential Proclamation (4667 of July 10, 1979, 44 Fed.Reg. 40629) putting the standby plan into effect. As to those buildings, temperature restrictions the President ordered in directions to heads of executive agencies were declared "effective immediately." *Id.* at 1–2, 4. *See also* 15 Weekly Comp. of Pres.Doc. 647 (April 10, 1979).

**10.** 44 Fed.Reg. 48638 (1979).

**11.** *Id.* at 48640. *See* note 29 *infra*.

**12.** That review responded to a Veterans Administration (VA) inquiry concerning a federal agency's authority to charge employees for parking spaces. The Comptroller General stated, *inter alia*, that "40 U.S.C. § 490(k) authorizes VA to impose charges for employee parking if, but only if, rates therefor have been approved by GSA and OMB." While stating "it seems clear" under 40 U.S.C. § 490(j)-(k) that charges for employee parking could be imposed, the Comptroller General reported GSA's view that "if [a parking fee] policy is adopted, it should be applied on a uniform basis, without regard to the preference of a single agency." 55 Comp.Gen. 897, 900 (1976).

**13.** 44 Fed.Reg. at 48640.

**14.** 44 Fed.Reg. 53161 (1979).

**15.** For the phase in period the charge was set at 50 percent of the GSA-established commercial rates. Complete exemption was provided where the comparable commercial rate was less than $10 per month. *Id.* at 53163.

free parking was restored by the district court order now before us on appeal.[16]

## II. The District Court's Analysis

Energy conservation was the paid parking plan's *"raison d'etre,"* the district court declared, other reasons offered were "merely incidental." [17] The EPCA had granted the President standby authority, subject to congressional review, "to reduce demand for energy through the implementation of energy conservation [contingency] plans." [18] An "energy conservation contingency plan" is defined in the Act as "a plan which imposes reasonable restrictions on the public or private use of energy which are necessary to reduce energy consumption." [19] The paid parking plan "imposes restrictions on the use of energy and its purpose is to reduce energy consumption," [20] the district court stressed. Therefore, that court concluded, the plans falls squarely within EPCA territory. On this analysis, the district court reasoned, it was unnecessary to decide whether the parking plan "could have validly been implemented in reliance on the [FPASA] under any circumstances." [21] In the district court's view, the case turned on the "specific congressional command" in the EPCA "that energy conservation [contingency] plans could be implemented only after congressional review and with congressional concurrence." [22] That command, the district court believed, precluded the President from relying on more general authority: The President had ignored the EPCA and that meant the parking charge could not stand.[23]

We do not perceive as clearly as did the district court that energy conservation eclipsed all other reasons for instituting parking charges. But even if we agreed that packaging the plan in an energy kit rendered air quality, cost recoupment, and other stated concerns "merely incidental," we would not conclude that the EPCA governed. The parking charge was not presented as a standby conservation plan for the short term, the kind of measure appropriate for the EPCA's "contingency plan" regime. Rather, it was put forward as a permanent fixture authorized by a law, the FPASA, that Congress had neither repealed nor revised. Because we do not read the EPCA as a statute encompassing the universe of energy-minded actions,[24] we must start with the inquiry the district court did not fully pursue: Was the parking charge authorized by and validly imposed under the FPASA?

## III. Fees for Employee Parking in Federal Facilities Were Validly Imposed Under Executive Authority Stipulated in the FPASA

The central question, as we view this case, is "whether or to what extent" the FPASA authorized the executive initiation of charges to individual federal employees for the use of federally owned parking spaces. *See NAACP v. FPC*, 425 U.S. 662, 665, 96 S.Ct. 1806, 1809, 48 L.Ed.2d 284

**16.** Prior to the district court's injunction, the total amount collected by executive branch agencies was approximately $20 million.

**17.** *American Fed'n of Gov't Employees v. Freeman*, 510 F.Supp. 596, 602 & n.17 (D.D.C.1981).

**18.** 42 U.S.C. § 6201(1).

**19.** 42 U.S.C. § 6262(a)(1).

**20.** 510 F.Supp. at 602.

**21.** *Id.*

**22.** *Id.* at 605.

**23.** In an earlier opinion denying the Administrator's motion to dismiss, filed September 25, 1980, the district court previewed its ultimate decision that the President's energy conservation purpose impelled classification of charges for employee parking as an EPCA "energy conservation contingency plan" which could become effective only after transmittal of the President's proposal to Congress and approval by both Houses pursuant to 42 U.S.C. § 6261.

**24.** Indeed, the EPCA itself recognizes the full force of the President's authority under "other law." 42 U.S.C. § 6361(a). *But cf.* 510 F.Supp. at 603–04 & n.26 (indicating, as did the earlier, September 25, 1980, district court opinion, a belief that energy-minded Presidential action could not be grounded in pre-EPCA executive authority; instead, in the district court's view, such action required compliance with the EPCA's procedures and limitations or new legislation).

(1976).[25] Section 486(a) of this Act provides:

The President may prescribe such policies and directives, not inconsistent with the provisions of this Act, as he shall deem necessary to effectuate the provisions of said Act, which policies and directives shall govern the [General Services] Administrator and executive agencies in carrying out their respective functions hereunder.[26]

25. The district court, because it viewed the EPCA as controlling, did not decide whether the FPASA permitted the free parking phase out. *See* 510 F.Supp. at 600–02. Appellee National Treasury Employees Union (NTEU) argues that, if this court should hold, as it does, that the EPCA does not apply to the parking plan, the proper course would be a remand to allow the district court to address this issue in the first instance. NTEU Brief at 34.

Although "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed on below," *Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976), "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Id.* at 121, 96 S.Ct. at 2877. "Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt. . . ." *Id.* We believe this is such a case. All parties have fully addressed the question we consider central, both in this court and in the district court. "This is not a case, therefore, where resolution of an issue for the first time on appeal would cause undue surprise or prejudice." *Grace v. Burger,* 665 F.2d 1193, 1197 n.9 (D.C.Cir.1981). Since we find the resolution "beyond any doubt," we "believe that a remand to the District Court, which inevitably would result in a future appeal to this court, 'would be a waste of judicial resources.'" *Id.* at 1197 n.9 (quoting *United States v. Aulet,* 618 F.2d 182, 186 (2d Cir. 1980)).

26. Federal Property and Administrative Services Act of 1949, ch. 288, § 205(a), 63 Stat. 389, *codified at* 40 U.S.C. § 486(a). For discussion of the genesis of both the FPASA and this particular section, *see AFL–CIO v. Kahn,* 618 F.2d 784, 787–89 (D.C.Cir.) (en banc), *cert. denied,* 443 U.S. 915, 99 S.Ct. 3107, 61 L.Ed.2d 879 (1979).

27. As detailed earlier, the President approved the parking plan, and steps to implement it, by initialing a position paper. *See* p. 817 *supra.* The district court did not decide "wheth-

The legitimacy under section 486(a) of President Carter's prescription of the free parking phase out,[27] implemented by OMB Circular No. A–118 and, in turn, GSA Temporary Regulation D–65, thus depends on whether the President acted "to effectuate the provisions" of the FPASA and, if he did, whether his action was "not inconsistent with" any specific provision of the Act. *See AFL–CIO v. Kahn, supra,* 618 F.2d at 788.

er a Presidential speech or a checkmark on a memorandum was sufficient to delegate authority to OMB, or whether a more formal writing such as an Executive Order or proclamation was required." 510 F.Supp. at 600 n.11. Appellee American Federation of Government Employees (AFGE) argues that a more formal directive was required. AFGE Brief at 25 n.41. We disagree.

Our research has not revealed, and the parties have not cited, any relevant statute or judicial decision requiring the President, in a case such as this one, to act by Executive Order or any other formal proclamation. Many commands the President gives to his subordinates are verbal; only a fraction of his directives appear in the Federal Register. *See* Fleishman & Aufses, *Law and Orders: The Problem of Presidential Legislation,* 40 Law & Contemp. Prob. 1, 7 (Summer 1976). Presidential action has been taken simply by writing "approved" or "Let it be done" at the end of a recommendation drawn by a subordinate. Senate Special Comm. on National Emergencies and Delegated Emergency Powers, 93d Cong., 2d Sess., Executive Orders: A Brief History of Their Use and the President's Power to Issue Them 2 (Comm. Print 1977). Indeed, the Federal Register Act, 44 U.S.C. § 1505(a)(1), expressly excludes from its publication requirement those Presidential directives, as in the instant case, which are "effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof." (The memorandum from the President to agency heads mandating temperature restrictions in federal buildings, *see* note 9 *supra,* is a further example of a Presidential action taken without the formality of an Executive Order.) Nor does section 486(a) limit Presidential action taken thereunder to "Executive Orders." It simply states that the President may prescribe "policies and directives."

Finally, no party can claim lack of notice of the inauguration of the parking fee program. Temporary Regulation D–65 was published in the Federal Register. *See* 44 Fed.Reg. 53161 (1979). In effect, the Presidential action at issue provided the stimulus that provoked promulgation of this Regulation.

The provisions of the FPASA are effectuated if the executive action in question assists "the Government [in obtaining] an economical and efficient system for ... the utilization of available property."[28] We believe it evident that the free parking phase out fits this description. The phase out would allow the government to recover annually an amount estimated to exceed $30 million. This cost recovery consideration was cited in the parking issue paper that elicited the President's action. In short, we find it inescapably obvious that the institution of parking charges would, indeed, assist the government in utilizing its property efficiently and economically.

■ Appellees do not suggest that cost recovery or elimination of a benefit spread unevenly among federal employees falls beyond the pale of section 486(a). They emphasize, however, the energy conservation concern announced in support of the parking charge. The parking issue paper mentioned in addition other national goals not directly linked to economy and efficiency in government property management—cleaner air and reduced traffic congestion. We cannot agree that an exercise of section 486(a) authority becomes illegitimate if, in design and operation, the President's prescription, in addition to promoting economy and efficiency, serves other, not impermissi-

ble, ends as well. Our position in this regard is informed by notable precedent. *See, e.g., AFL–CIO v. Kahn, supra,* 618 F.2d at 792–93 (additional goal of slowing inflation in the economy as a whole); *Contractors Association v. Secretary of Labor,* 442 F.2d 159, 171 (3d Cir.) (additional goal of promoting enhanced employment opportunities for minorities), *cert. denied,* 404 U.S. 854, 92 S.Ct. 98, 30 L.Ed.2d 95 (1971); *Farmer v. Philadelphia Electric Co.,* 329 F.2d 3, 8 (3d Cir. 1964) (additional goal of checking racial discrimination).

Appellees further urge that even if the parking charge was intended to and would in fact effectuate the general provisions of the FPASA relating to economical and efficient utilization of government property, the action at issue is nonetheless invalid because it is inconsistent with specific provisions of the Act. For this argument, appellees rely on sections 490(j) and (k) of the FPASA.[29] These sections, they contend, confer authority to impose space occupancy charges directly upon the Administrator of GSA and executive agencies. According to appellees, any command emanating from the President imposing space-occupancy charges, directing the Administrator to do so, or delegating authority in the premises to OMB would be inconsistent with the

---

**28.** FPASA of 1949, ch. 288, § 2, 63 Stat. 378, *codified at* 40 U.S.C. § 471. *Cf. AFL–CIO v. Kahn, supra,* 618 F.2d at 788; *Liberty Mutual Ins. Co. v. Friedman,* 639 F.2d 164, 169 (4th Cir. 1981) (FPASA sets forth goal of economical and efficient system for procurement and supply).

**29.** 40 U.S.C. § 490 provides in relevant part:
(j) The Administrator is authorized and directed to charge anyone furnished services, space, quarters, maintenance, repair, or other facilities (hereinafter referred to as space and services), at rates to be determined by the Administrator from time to time and provided for in regulations issued by him. Such rates and charges shall approximate commercial charges for comparable space and services, except that with respect to those buildings for which the Administrator of General Services is responsible for alterations only (as the term "alter" is defined in section 612(5) of this title), the rates charged the occupant for such services shall be fixed by the Administrator so as to recover only the

approximate applicable cost incurred by him in providing such alterations. The Administrator may exempt anyone from the charges required by this subsection if he determines that such charges would be infeasible or impractical. To the extent any such exemption is granted, appropriations to the General Services Administration are authorized to reimburse the fund for any loss of revenue.
(k) Any executive agency, other than the General Services Administration, which provides to anyone space and services set forth in subsection (j) of this section, is authorized to charge the occupant for such space and services at rates approved by the Administrator. Moneys derived by such executive agency from such rates or fees shall be credited to the appropriation or fund initially charged for providing the service, except that amounts which are in excess of actual operating and maintenance costs of providing the service shall be credited to miscellaneous receipts unless otherwise authorized by law.

statutory provisions explicitly authorizing action by "the Administrator" and by an "executive agency."

■ We find this argument unpersuasive. The plain language of section 486(a) states that policies and directives the President prescribes "shall govern the Administrator and executive agencies in carrying out their respective functions hereunder." The legislative history of the FPASA, moreover, confirms that Congress intended section 486(a) to clarify that "Presidential policies and directives shall govern—not merely guide—not only the Administrator but all executive agencies in carrying out these property-management functions." [30] Sections 490(j) and (k), it is true, state what the Administrator and an executive agency are authorized to do. But section 486(a) assigns to the President the lead role. Pursuant to that provision, the President has clear authority to direct the Administrator and executive agencies "in carrying out their respective functions" under specific FPASA provisions, including sections 490(j) and (k). Thus we find nothing "inconsistent with the provisions of [the FPASA]" in a directive by the President that requires the Administrator and agency heads to install [31] a system for collection of parking fees from individuals.[32]

30. 95 Cong.Rec. 7441 (1949) (remarks of Rep. Holifield). *See also* H.R.Rep. No. 670, 81st Cong., 1st Sess. 17 (1949); S.Rep. No. 475, 81st Cong., 1st Sess. 3, 19 (1949). Representative Holifield, the House sponsor of the FPASA, further stated, "Here we have established, therefore, a clear-cut line of authority running directly from the President and involving a very close working relationship between the President and the Administrator." 95 Cong.Rec. 7441.

31. The district court raised, without deciding, the question whether initiation of a fee was timely under sections 490(j) and (k) of the FPASA. *See* 510 F.Supp. at 600–01 n.13. Section 11 of the Public Buildings Amendments of 1972, 40 U.S.C. § 603 note, states that

[t]he effective date of applying the rates to be charged pursuant to the regulations to be issued under subsections (j) and (k) [of section 490] shall be determined by the Administrator of General Services but in any event shall not be later than the beginning of the third full fiscal year subsequent to the enactment [of the Public Buildings Amendments of 1972].

Appellee NTEU, relying upon this provision, argues that any action taken by the Administrator pursuant to section 490 subsequent to 1975 is untimely. NTEU Brief at 37.

The government responds that the time limitations should be read to apply only to charges against the agencies because Congress wished to avoid undue delay in putting in place a system under which agencies would be required to account for the space they use. The time limitation would be divorced from its function, the government urges, if it were read to apply to the pass on of charges by the agencies. Despite the language of the statutory note, which refers expressly to section 490(k) as well as section 490(j), the government's position comports with the probable intent of Congress in stipulating a time limita-

tion. The legislative history suggests that the time directive was included solely to speed the process of rendering agencies accountable for the space they use:

While Section [11], the last section, makes the legislation effective upon enactment, it recognizes the necessity for postponing the effective date of the user charges for a reasonable period after enactment to accommodate the budgetary process.

Letter from Harry S. Trimmer, Jr., Assistant Administrator of GSA, to Carl Albert (August 4, 1971), *reprinted in* H.R.Rep. No. 989, 92d Cong., 2d Sess. 14 (1972). This statement indicates that Congress recognized some delay was unavoidable, but sought to insure that accommodation to the budgeting process would not take more than three years. We would be loath to ascribe to Congress a purpose to allow anyone, including an agency, to escape the obligation to account for space used simply because the Administrator failed to act within the three year time limitation. *Cf. Church of the Holy Trinity v. United States*, 143 U.S. 457, 472, 12 S.Ct. 511, 516, 36 L.Ed. 226 (1892).

However, in view of our position that the free parking phase out was validly initiated by the President pursuant to section 486(a), which has no time limitation, rather than section 490, we need not definitively resolve this issue.

32. Appellee NTEU argues that "nothing on the face of Sections 490(j) and (k), or in the legislative history, indicates that Congress intended that GSA or Federal agencies would charge individual employees who park on government-owned parking lots. The statutory language and its history speak only in terms of charging the agencies." NTEU Brief at 36. *See also* 510 F.Supp. at 600 n.12. In light of our holding, NTEU's argument amounts to an assertion that Presidential action under section 486(a), directing that individual employees be charged, is inconsistent with section 490, and is therefore

■ Finally, even in the absence of a clear statutory provision establishing a governing role for the President, we would not conclude that Congress, simply by assigning a function to an executive agency, thereby intended to exclude initiating action by the President. As this court has had recent occasion to observe, "Within the range of choice allowed by statute, the President may direct his subordinates' choices." *National Federation of Federal Employees, Local 1622 v. Brown*, 645 F.2d 1017, 1022 (D.C.Cir.1981). *See also National Treasury Employees Union v. Reagan*, 663 F.2d 239, 248 (D.C.Cir.1981); *Sierra Club v. Costle*, 657 F.2d 298, 406 & n.524 (D.C.Cir.1981).[33]

In sum, President Carter directed executive action—the phase out of free parking for federal employees—mindful of and fully compatible with the design of the FPASA to promote economy and efficiency in the utilization of government property. His authority to direct the phase out is securely established by section 486(a)[34] and no other provision of the Act is inconsistent with the action he commanded.

### IV. The President's Authority to Direct the Phase Out of Free Parking for Federal Employees Is Not Eliminated or Diminished by the EPCA

In the FPASA, Congress established a governing role for the President in setting policy and directing federal agencies regarding the procurement and management of government property. We have concluded that the phase out of free parking for federal employees, as determined by the President and implemented by OMB and GSA, falls comfortably within the property management executive authority conferred by section 486(a) of the FPASA. We now turn to the question whether Congress, when it enacted the EPCA, *sub silentio* withdrew or qualified the authority granted to the President under the FPASA.

■ As appellees acknowledge, the EPCA empowers the President "to respond quickly to energy supply interruptions or other energy crises."[35] It arms the President with new authority to initiate "contingency plans" for energy conservation in urgent circumstances.[36] But this novel au-

---

invalid. Even if we agreed with NTEU's premise concerning what appears "on the face" of the legislation, we would question the strained reading NTEU gives to the "not inconsistent with" proviso of section 486(a).

But we cannot accept NTEU's premise. The statute provides that "anyone," *see* note 29 *supra*, a term which ordinarily would include individuals, is subject to a charge for space use. Additionally, the legislative history does not bear out NTEU's position. The Senate version of section 490(k) would have allowed agencies, which provide space to other agencies, to charge only those other "agencies" for such space. *See* S.Rep. No. 412, 92d Cong., 1st Sess. 10 (1971). The House version, on the other hand, which was adopted at conference, allowed an agency to charge "anyone" provided space by the agency. H.R.Rep. No. 1097, 92d Cong., 2d Sess. 12 (1972). In view of this language change, we are unable to read section 490(k) as disallowing a charge to individual employees for the parking spaces they use. *See also* 55 Comp.Gen. 897, 899–900 (1976).

**33.** While a statutory provision assigning a function to an executive agency or officer ordinarily does not signal preclusion of a directing role for the President, "there may be duties so peculiarly and specifically committed to the discretion of a particular officer as to raise a question whether the President may overrule or revise the officer's interpretation of his statutory duty in a particular instance." *Myers v. United States*, 272 U.S. 52, 135, 47 S.Ct. 21, 31, 71 L.Ed. 160 (1926). However, nothing in the text or the legislative history of the FPASA leads us to conclude that section 490 "so peculiarly and specifically committed" discretion to the Administrator as to make the instant exercise of section 486(a) Presidential authority "inconsistent with the provisions" of section 490.

**34.** Because we conclude that the free parking phase out was authorized by section 486(a), we do not reach the question whether, as the government contends, President Carter's action draws independent support from the Take Care Clause of article II, section 3 of the Constitution.

**35.** NTEU Brief at 28.

**36.** *See* S.Rep. No. 26, 94th Cong., 1st Sess. 22 (1975) (bill "provides the authority to deal with

thority is subject to controls. First, and perhaps principally indicative of the crises character of the executive initiatives Congress envisioned, contingency plans may not run beyond nine months.[37] Second, while Congress must respond to the President's initiatives expeditiously (within 60 days of transmittal),[38] approval resolutions of both Houses are prerequisite to implementation of a contingency plan.[39] Third, certain measures may not be taken under the extraordinary EPCA contingency plan initiation and approval procedure. The President may not prescribe in a contingency plan "rationing or any tax, tariff, or user fee."[40] Nor may he propose in this manner "any provision respecting the price of petroleum products," or "provide for a credit or deduction in computing any tax."[41] New law in these areas, even for a short term, must be made through the regular legislative process. The EPCA's contingency plan provisions thus guardedly augment the President's power. We cannot read into the Act's qualified, crisis-focused grant of extraordinary power[42] any intention to terminate or modify authority Congress earlier had accorded the President.[43]

situations created by severe energy shortages"); H.R.Rep. No. 340, 94th Cong., 1st Sess. 1 (1975), U.S.Code Cong. & Admin.News 1975, p. 1762.

**37.** 42 U.S.C. § 6261(a)(1).

The finding specified in 42 U.S.C. § 6261(b)(3), "that putting such contingency plan into effect is required by a severe energy supply interruption or in order to fulfill obligations of the United States under the international energy program," must be made anew at the end of each nine month period to continue a contingency plan in effect. Such a renewed finding was made by President Carter when he sought continuation of the Emergency Building Temperature Restrictions, *see* note 47 *infra*, beyond the original nine-month period. *See* Pres.Proc. No. 4750, 45 Fed.Reg. 26019 (1980).

**38.** 42 U.S.C. § 6422(b)(1).

**39.** 42 U.S.C. § 6261(b)(2).

**40.** 42 U.S.C. § 6262(a)(2). In response to the Administrator's argument that a parking charge is a "user fee" to which the EPCA has no application, the district court said the characterization question need not be decided: "[I]f the charges are not user fees, then the paid parking plan is an 'energy conservation contingency plan,' and compliance with the EPCA procedures for expedited congressional review was required. If the charges do constitute user fees, then new legislation was required to authorize their imposition for conservation purposes." 510 F.Supp. at 604 n.26. That analysis is consistent with the district court's apparent view that the executive may not act to conserve energy unless the action is taken under the EPCA or pursuant to specific energy-minded legislation enacted thereafter. For the reasons indicated in this opinion, we reject that expansive interpretation of the EPCA's province.

**41.** 42 U.S.C. § 6262(a)(2).

**42.** *See* S.Rep. No. 26, *supra* note 36, at 22, 25; H.R.Rep. No. 340, *supra* note 36, at 1, 22; 121 Cong.Rec. 22744 (1975) (remarks of Rep. Dingell, House manager of the EPCA) ("Extraordinary powers, subject to congressional review, have been included which would authorize the President to impose mandatory energy conservation plans and a gasoline rationing plan under narrowly defined circumstances."); *id.* at 41041 (remarks of Sen. Hartke) (bill "establishes standby energy authorities to allow the President to deal with emergency situations"); *id.* at 9157 (remarks of Sen. Bumpers); *id.* at 22742 (remarks of Rep. Wirth); Letter from Frank Zarb, FEA Administrator, to Rep. Staggers, Chairman of the House Committee on Interstate and Foreign Commerce (June 16, 1975), *reprinted in* H.R.Rep. No. 340, *supra* note 36, at 113 ("these authorities are intended only to provide this country the means whereby we might cope with another acute emergency such as last year's embargo"). The extraordinary nature of the power the EPCA grants to the President is further indicated by the statute's subheadings. Contingency plan provisions appear in Subchapter II, Part A of the Act; Subchapter II is headed "Standby Energy Authorities," Part A is titled "General Emergency Authorities."

**43.** *Cf. Udall v. Littell,* 366 F.2d 668, 673–74 (D.C.Cir.1966) (specific statutory provision addressed to particularly identified problem "does not by itself indicate the Executive Branch lacks authority to act under other [earlier enacted] statutory provisions").

Our view that the EPCA does not subtract from authority that other legislation, including the FPASA, confers is buttressed by references in the text of the Act. Signalling that the EPCA does not repeal other laws by sweeping within its governance all federal attempts to curtail prodigal use of energy, the Act calls upon the President to exercise his authority "under other law" to develop standards with respect to energy efficiency in Government procurement policies and decisions.[44] It further instructs the President, "to the extent of his authority under other law," to implement a long-range (10-year) plan for energy conservation in buildings owned or leased by federal agencies.[45]

Appellees call to our attention the President's resort to the EPCA to gain approval from Congress for two of the energy programs listed in the White House fact sheet released at the time of the President's April 5, 1979 energy address.[46] Formal EPCA contingency plans were presented to Congress for building temperature restrictions[47] and mandatory weekend closing of gasoline stations.[48] If these programs were subject to the EPCA, appellees reason, then the parking program listed in the very same fact sheet was equally subject to that Act's regime.[49] The flaw in this reasoning is apparent. No "other law"[50] authorized the President to impose thermostat controls in nonpublic buildings.[51] Nor did any "other law" provide for the closing of privately owned gasoline stations by federal command.

To summarize, we reject the notion that all "Presidential actions attempting to conserve energy must be taken pursuant to the EPCA."[52] Rather, we believe the EPCA contingency plan provisions on which appellees rely must be invoked only in situations not provided for in other laws. The executive action taken here is covered by another law, the FPASA. Consistent with the lead role the FPASA reserves for the Chief Executive in government property management, the President directed executive agencies subject to his supervision to impose fees for parking spaces furnished to federal employees. One of the stated purposes for that direction was cost recovery, and there is no doubt that the measure in fact serves a genuine interest in thrifty management of government facilities. The program is not rendered unlawful because it was billed as an energy-minded measure and in fact may work to conserve energy. We decline to convert a law designed to enhance the President's power to act in energy crises into an instrument to shear the Chief Executive's authority under other

44. 42 U.S.C. § 6361(a)(1).

45. 42 U.S.C. § 6361(a)(2).

46. *See* note 9 *supra.*

47. Emergency Building Temperature Restrictions (Standby Conservation Plan No. 2), *reprinted in* Notice of Final Energy Conservation Contingency Plans, 44 Fed.Reg. 12906, 12911–14 (1979) (applicable to all nonresidential buildings (except healthcare facilities) in the private and public sector).

48. Emergency Weekend Gasoline Sales Restrictions (Standby Conservation Plan No. 1), *reprinted in* Notice of Final Energy Conservation Contingency Plans, *supra* note 47, 44 Fed.Reg. at 12907–11 (owner of retail filling station may not sell or otherwise transfer gasoline or diesel fuel during restricted hours).

49. *See* NTEU Brief at 31.

50. *Cf.* 42 U.S.C. § 6361(a).

51. The "contingency plan" on thermostat controls approved by Congress under the EPCA covered public as well as private nonresidential buildings. However, authority for imposing controls in federal buildings was not dependent upon the EPCA. *See* note 9 *supra.* Appellees acknowledge executive authority, at least in GSA, "to conserve energy, e.g., in relation to the heating of government buildings," and do not suggest such conservation must abide compliance with the EPCA's congressional approval procedure. *See* AFGE Brief at 40.

52. AFGE Brief at 30.

legislation. Since the district court judgment has that effect, we reverse that judgment[53] and remand with instructions to enter judgment in favor of the Administrator.

*It is so ordered.*

**53.** The government has not requested that we authorize collection of fees from individuals for the period the district court's injunction was in effect, although it has reserved its rights to seek such relief. *See* Joint Appendix at 102 ¶ 2B. Without deciding the question, we note that restitution upon the reversal of a judgment, like restitution generally, is not automatic. Rather, it "rest[s] in the exercise of a sound discretion," and may be denied "where the justice of the case does not call for it." *Atlantic Coast Line R.R. v. Florida*, 295 U.S. 301, 310, 55 S.Ct. 713, 717, 79 L.Ed. 1451 (1935) (Cardozo, J.) (quoting *Gould v. McFall*, 118 Pa. 455, 456, 12 A. 336, 337 (1888)). *Accord, Democratic Central Comm. v. Washington Metropolitan Area Transit Comm'n*, 485 F.2d 786, 825 (D.C. Cir.1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974); *Williams v. Washington Metropolitan Area Transit Comm'n*, 415 F.2d 922, 944 (D.C.Cir.1968) (en banc), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969); Restatement of Restitution § 74 & comment c (1937).